KBIKSISS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                       15 CR 605 (RJS)

MARLON SISNERO-GIL,

          Defendant.

------------------------------x

                                 New York, N.Y.
                                 November 18, 2020
                                 10:25 a.m.

Before:

               HON. RICHARD J. SULLIVAN,

                               Circuit Judge
                          Sitting By Designation

                    APPEARANCES

AUDREY STRAUSS,
     Acting United States Attorney for the
     Southern District of New York
STEPHANIE LAKE
     Assistant United States Attorney

OLIVER S. STORCH
     Attorney for Defendant

ALSO PRESENT:

MIRTA HESS-LOEDEL, Spanish Interpreter
SONIA BERAH, Spanish Interpreter
DEREK MARTINEZ, FBI

1          (Case called)

2          THE COURT:  Good morning, everyone.  We are here for a

3     sentencing.  I want to take appearances.

4          We're proceeding live for Mr. Sisnero-Gil, but we've

5     got the lawyers on the line, so they're appearing via video.

6     So I want to take appearances from them and make sure we can

7     hear them and see them.  We'll begin with the government.

8          MS. LAKE:  Good morning, your Honor.  Stephanie Lake,

9     for the United States.

10         THE COURT:  Ms. Lake, can you see me and see these

11    proceedings?

12         MS. LAKE:  Yes, your Honor.

13         THE COURT:  Okay.

14         And for the defendant?

15         MR. STORCH:  For Mr. Sisnero-Gil, Oliver Storch.  Good

16    morning, your Honor.

17         THE COURT:  Okay.  Mr. Storch, good morning.  Same

18    question, you can see me and hear me okay?

19         MR. STORCH:  Yes, I can, your Honor.

20         THE COURT:  You can also see the courtroom, including

21    your client?

22         MR. STORCH:  Yes, I can, your Honor.

23         THE COURT:  All right.

24         Mr. Sisnero-Gil, you're here in front of me, so I can

25    see you, obviously.  Are you able to hear everything all right?

1          THE DEFENDANT:  Yes.

2          THE COURT:  I'll note for the record that

3   Mr. Sisnero-Gil is utilizing the services of a court-certified

4   interpreter.  The interpreter is translating these proceedings

5   from English into Spanish and vice versa, since that is

6   Mr. Sisnero-Gil's native language.

7          And, Mr. Sisnero-Gil, if at any point, you have

8   difficulty understanding this proceeding, then, of course, let

9   me know.  If it's an equipment problem, or a language problem,

10  or maybe just I'm not being clear, or the lawyers are not being

11  clear, whatever the problem, we can fix it, but we'll need you

12  to tell us if you're having any difficulty understanding, all

13  right?

14         THE DEFENDANT:  Yes.

15         THE COURT:  All right.

16         I also want to make sure that you're able to see the

17  attorneys on the screen there.  Can you see Mr. Storch?

18         THE DEFENDANT:  Yes.

19         THE COURT:  And you can see the government attorney,

20  Ms. Lake?

21         THE DEFENDANT:  Yes.

22         THE COURT:  And you were able to hear them when they

23  were speaking?

24         THE DEFENDANT:  Yes.  Hear?

25         THE COURT:  When they were speaking earlier, were you

1    able to hear them?

2                 THE DEFENDANT:  No.

3                 THE COURT:  Well, Mr. Storch say something.

4                 MR. STORCH:  Yes, your Honor.

5                 THE COURT:  So you're able to hear that, right,

6    Mr. Sisnero-Gil?

7                 THE DEFENDANT:  Yes.

8                 THE COURT:  Okay.

9                 So I think the equipment is pretty good, so we should

10   be all right, but if there's a problem, let us know.

11                I want to make sure that you're comfortable proceeding

12   this way.  Ordinarily, your lawyer would be seated next to you.

13   Ordinarily, before COVID, we would be doing this the normal

14   way, your lawyer would be right next to you, you could talk to

15   each other directly.  If Mr. Storch were here, you'd be

16   separated by a distance, you'd be at that end of the table and

17   he'd be at the other end of the table.  You'd still probably

18   have to communicate by phone because you couldn't get within a

19   few feet of each other.  That's the way we're doing things in

20   light of the pandemic.

21                So it would be a little different than usual even if

22   Mr. Storch were here, but today, obviously, he's not here, he's

23   here by videoconference.  And so are you comfortable proceeding

24   this way?

25                THE DEFENDANT:  Yes.

KBIKSISS

1      THE COURT:  If at any point, you want to confer with

2   Mr. Storch, let us know, and we'll figure out a way to make

3   that happen, so that you can confer privately and

4   confidentially, but, otherwise, we're going to proceed now with

5   the sentencing.  All right?

6      THE DEFENDANT:  Yes.

7      THE COURT:  Okay.

8      Let me just remind everybody where we've been.  This

9   is a case that was commenced back in 2015.  Mr. Sisnero-Gil was

10  arrested on or about May 14th of 2015, he was charged in a

11  complaint the following day, presented before a magistrate

12  judge, released on bail with the consent of the government.

13  Several months later, there was an indictment filed that named

14  Mr. Sisnero-Gil that included him in an indictment with several

15  other individuals.  That was in January of 2016.  The case was

16  then assigned to me.

17      We had an initial conference at which Mr. Sisnero-Gil

18  was arraigned and pled not guilty.  We then came together in

19  March of 2016, at which time it was expected that

20  Mr. Sisnero-Gil might plead guilty, but he chose not to, and

21  that's fine, it's certainly his right.

22      So we scheduled a trial for April of 2016, April 25th.

23  A superseding indictment was filed by the government on

24  March 28th.  I scheduled a conference for later that month --

25  or April, actually.  Another superseder was filed, I guess, in

1    April – that was the S6 superseder – but Mr. Sisnero-Gil failed

2    to appear for the final pretrial conference, which was

3    April 19th of 2016.

4         I issued a warrant for his arrest, and I also then

5    forfeited his bond of $100,000, and issued a judgment against

6    him, as well as against his two sisters, who were the cosigners

7    on the bond.  I explained to them that if Mr. Sisnero-Gil

8    surrendered and returned to court, they would not be liable, I

9    would not issue an order against them, but Mr. Sisnero-Gil did

10   not appear.  In fact, he remained a fugitive for approximately

11   three years.  It was only after a lot of time and a lot of

12   expense, an extradition package to the Dominican Republic was

13   sent by the government, that Mr. Sisnero-Gil was apprehended in

14   the Dominican Republic and brought back to the United States to

15   face these charges.  I didn't see him again until April 15th of

16   2019.

17        At that point, new counsel was appointed,

18   Mr. Sisnero-Gil was arraigned and pled not guilty to a new

19   superseding indictment, S7 indictment.  About a month later,

20   Mr. Storch came on as new counsel.  I scheduled trial for

21   October of 2019.  Prior to trial, in September, Mr. Sisnero-Gil

22   pleaded guilty to the three counts of the superseding

23   indictment.

24        I scheduled sentencing for December of 2019.  That got

25   adjourned.  I rescheduled to February of 2020.  That got

adjourned.  I then rescheduled to March of 2020.  That also got

adjourned.  April of 2020, June of 2020, all these things got

adjourned, in part, because of the COVID crisis that had then

emerged.  So I finally scheduled for September of 2020, and

then the last time, I rescheduled for today, and so we're now

all here.

So that's the procedural history of this case.

I have reviewed, in preparation for sentencing, all of

the transcripts in this case, and there are a lot.  I've also

reviewed, of course, in particular, the transcript of the

guilty plea that took place before me on September 18th of

2019.  I was here for it, I remember it, but I refreshed myself

on that.

I've also reviewed the pretrial sentence report

prepared by the probation department.  That report was

initially dated November 12th of 2019.  It was then updated for

January 23rd, 2020.  It's 22 pages, single-spaced.

I have reviewed Mr. Storch's sentencing submission,

which is dated February 14th.  I've also reviewed the

government's sentencing submission, which is dated

February 21st, portions of which are sealed.  I have reviewed a

November 6th letter from Mr. Storch, a short letter, a

November 12th letter from the government on behalf of both

parties that represents that there are no remaining disputed

issues and no need for a Fatico hearing or sentencing hearing

1    on the disputed facts.

2          I've also received letters from the lawyers on behalf

3    of the two cosigners against whom there's a judgment, Lynette

4    Sisnero-Gil, the sister of the defendant, and Tanyi Gil, who is

5    the half sister of the defendant, each of whom signed the bond,

6    each of whom has a judgment against them, and each is asking

7    the Court to basically vacate the judgment against them.

8          Finally, I have a consent preliminary order of

9    forfeiture that the government sent me, I believe, yesterday

10   calling for forfeiture in the amount of $30,000, I believe.  It

11   appears that it's been signed or has signature lines for both

12   parties.  I don't have the executed one, but maybe somebody

13   does.  And then I just this morning got something from Marlon

14   Kirton, on behalf of Tanyi Gil, who updated his earlier

15   submission of November 16th.

16         So that's what I've got.  Is there anything that I'm

17   missing?

18         MS. LAKE:  Not that the government is aware of, your

19   Honor.

20         MR. STORCH:  And not from the defense, your Honor.

21         THE COURT:  All right.

22         Normally, Mr. Sisnero-Gil, where I would start is sort

23   of where we've left off the last time we were here together for

24   the guilty plea.  As I told you then, there are a number of

25   factors that a judge has to consider in deciding what sentence

1    to impose on the defendant.  One of those factors is something

2    called the United States Sentencing Guidelines.  I think I told

3    you about the guidelines; I showed you this book.

4                Do you remember that?

5                Okay.  We're going to talk about this book and how it

6    applies.  Mr. Sisnero-Gil, you have to say yes or no.  So do

7    you recognize this book and the sentencing guidelines that I

8    mentioned before?

9                THE DEFENDANT:  Yes.

10               THE COURT:  Okay.

11               Before I do that, I first want to just make sure that

12   you had a chance to review the presentence report with your

13   attorney.

14               So, Mr. Storch, did you review the presentence report

15   with your client?

16               MR. STORCH:  I did, your Honor.  It was reviewed and

17   translated into the Spanish language and reviewed with

18   Mr. Sisnero.

19               THE COURT:  Okay.

20               And, Mr. Sisnero-Gil, is that accurate?  You had a

21   chance to review that report?

22               THE DEFENDANT:  Yes, yes.

23               THE COURT:  And then let me ask the government.

24   Ms. Lake, you've had a chance to review the presentence report?

25               MS. LAKE:  Yes, your Honor.

1    THE COURT:  Do you have any objections to what's in

2 the report?

3    MS. LAKE:  The only thing I would note is, as

4 reflected in the government's sentencing submission, the

5 government, based on new facts that it learned after the guilty

6 plea and after the PSR was prepared, does not believe that the

7 safety valve applies.

8    THE COURT:  Right, that was in your letter.

9    And so, Mr. Storch, you understand that?

10    MR. STORCH:  I do, your Honor.  I discussed the issue

11 with my client, and the defense will not be able to prove that

12 the safety valve is applicable here.  Given the standard in

13 this case, we'll not be able to meet that burden, your Honor.

14    THE COURT:  Okay.  And that's because of -- the

15 government has alleged that your client made false statements

16 to them in the course of a safety-valve proffer, and that that

17 is the reason why he's not entitled or why he hasn't met the

18 criteria for the safety valve.  And so that's my question:  Do

19 you want a hearing on that?

20    MR. STORCH:  I appreciate that, your Honor.  I

21 discussed that at length with my client, I've spoken to counsel

22 for other involved parties, and the defense will not be able to

23 meet their burden by a preponderance of the evidence that he

24 should be entitled to the safety valve, your Honor.

25    THE COURT:  All right.  If that's the case, then, that

1    does alter the guidelines calculation, which I'll talk about in

2    a minute.

3             As I said, there are a number of factors that I have

4    to consider, Mr. Sisnero-Gil.  One of them is this book, this

5    guidelines manual.  This manual is not mandatory, I don't have

6    to follow it, but I have to consider it, and so that's what I

7    will do here.

8             You've pled guilty to three crimes.  One is conspiracy

9    to distribute -- it appears we lost the video and audio.

10            (Pause)

11            THE COURT:  Mr. Sisnero-Gil, we're going to try to

12   correct this situation.  I'm not sure what happened.

13            (Pause)

14            THE COURT:  Can everybody hear and see?  We had a

15   minor glitch, but I think we're back and ready to go.

16            MR. STORCH:  I can hear, your Honor.  I can't see you,

17   but I can hear you.

18            THE COURT:  You can't see me?

19            MR. STORCH:  No.  I think if the Court speaks -- I

20   thought it's supposed to switch to the speaker, whoever is

21   speaking.  I'm going to check -- one moment, your Honor?  I

22   have another -- I have a laptop.  I might be -- one moment,

23   your Honor, please?

24            THE COURT:  Okay.

25            THE LAW CLERK:  Ms. Lake, can you see the courtroom?

1          MS. LAKE:  Yes, I can see the courtroom and the Judge.

2          THE COURT:  Mr. Storch, can you see me?

3          MR. STORCH:  I cannot see you, your Honor, I can only

4  see Ms. Lake, but I am going to have my law school intern try

5  to see if I can do it on a laptop.

6          THE COURT:  But you could see me before, right?

7          MR. STORCH:  Yes, that's correct, your Honor.

8          THE COURT:  My screen is not any different.

9          MS. LAKE:  Your Honor, I believe the issue is that

10  Mr. Storch is using an iPad, and it only shows one participant

11  out of all of the participants on the iPad.

12          MR. STORCH:  Your Honor, I rectified that.  I'm using

13  a laptop, and I can see all parties now.

14          THE COURT:  Okay.

15          (Pause)

16          MR. STORCH:  I'm ready, your Honor.  I apologize for

17  the inconvenience.

18          THE COURT:  Don't apologize, but we were getting a lot

19  of feedback because I think you're on two devices.

20          MR. STORCH:  I'm certainly on the iPhone, your Honor.

21          THE COURT:  Yes, but now we can't see you.  Can you

22  hear us?

23          Mr. Storch, I can't hear you, and I can't see you,

24  though there is a spot on the screen that lists you as a guest.

25  Twice, actually.

1    You either don't have your camera on and perhaps are

2    muted for your laptop or --

3    MR. STORCH:  I can hear you, and I can see you, your

4    Honor.

5    THE COURT:  Okay.  Now I can see you, all right.  A

6    little blurred, but --

7    MR. STORCH:  Well, I have a great face for radio, your

8    Honor.  Can your Honor see me now?

9    THE COURT:  Yes, I can see you now.  It's not as sharp

10   a picture as before, but it's good enough.

11   Let me ask Mr. Sisnero-Gil.  You can see Mr. Storch

12   and hear him?

13   THE DEFENDANT:  Yes.

14   THE COURT:  All right.

15   So I think we're okay, so let's resume.

16   I was just talking about the charges that

17   Mr. Sisnero-Gil pleaded guilty to.  Count One was a conspiracy

18   to distribute cocaine, five kilograms or more of cocaine.  That

19   carries a maximum sentence of life and a mandatory minimum term

20   of ten years.  Because you concede that you're not eligible for

21   the safety valve, then I'm not permitted to sentence you below

22   ten years even if I wished to.  So it's a mandatory minimum

23   ten-year sentence with a maximum of life.

24   Count Two charges you with the possession with the

25   intent to distribute cocaine.  That carries a mandatory

1    sentence of five years and a maximum sentence of 40 years.

2         The last count charges you with failure to appear in

3    court.  That's the bail-jumping count.  That carries a maximum

4    sentence of ten years, no mandatory minimum sentence, but it

5    requires that any sentence I impose on that violation run

6    consecutive to the sentence imposed on the other two counts.

7         So those are the three counts that you pleaded guilty

8    to.  Mandatory ten years on Count One, mandatory five years on

9    Count Two, but I still have to do a guidelines calculation for

10   all of them.  So we're going to spend a few minutes now talking

11   about how these guidelines apply in this case.  And if you have

12   any questions, of course, let me know.

13        As I think I mentioned to you before, these guidelines

14   are designed to give guidance to judges like me who have to

15   impose sentences on human beings, people.  And the way it works

16   is that every crime or type of crime is covered by a chapter in

17   this book, and the judge goes to the relevant chapter, makes

18   findings of fact as prompted in the chapter.  Based on those

19   findings, the judge then assigns points in accordance with

20   what's in the book.  The judge then adds those points, in some

21   cases, subtracts points, and the judge comes up with a number.

22   That number is referred to as the offense level, the offense

23   level.

24        The judge then goes to another chapter in this book,

25   and that's a chapter that relates to criminal history, and, not

surprisingly, people who have committed crimes before, people
who have been sentenced to prison before, they will typically
be treated more harshly than a person who has no prior
convictions or relatively minor ones.

So, I'll go through your criminal history, I'll make
findings as to whether you have prior convictions; if so, when
and for how long.  Depending on the answers to those questions,
I will assign points, as directed by the book, I will add those
up, and then I will come up with another number.  That number
is the criminal history category.  There are six criminal
history categories.  Category I is the lowest and least
serious; Category VI is the highest and most serious.  And then
with those two numbers, the offense level, on the one hand, and
the criminal history category, on the other, I then will go to
the back of this book, where there's a chart, it's like a table
or a grid, and I will go down this column here on the far left,
which is the offense level column, it starts at 1 and goes all
the way down to 43, and I will keep going down until I reach
the offense level that I found to be appropriate in this case.

I will then go across these other columns, each of
which reflects a criminal history category, and I will keep
going until I reach the criminal history category that applies
in this case.  Where my finger finally stops after that
exercise, well, that is the range that, in the view of
commission which prepared this book, would be appropriate.

1      Now, as I said, I don't have to follow this book.  I'm

2  free to go above or below the range in this book.  I have no

3  discretion, however, to go below the mandatory minimum

4  sentence.  That's set by statute, that's required, so if the

5  guidelines are lower than ten years or if I want to go lower

6  than ten years, I can't.  Ten years is the lowest I can

7  possibly go; life is the highest I can go.

8      So that's how the guidelines work.  Do you have any

9  questions about that, as a general matter?

10      THE DEFENDANT:  No.

11      THE COURT:  All right.

12      You had a chance to discuss this with Mr. Storch?

13      THE DEFENDANT:  Yes.

14      THE COURT:  Okay.

15      So, in this case, the presentence report sets forth

16  the probation department's view as to what the guidelines are,

17  and that begins on page -- I guess it begins on page 9 and

18  continues on page 10.  Because of the amount of drugs that the

19  parties stipulated to, which is 15 kilograms of cocaine, but

20  less than 50 kilograms of cocaine, the base offense level is

21  32.

22      Because it now is agreed by the parties that

23  Mr. Sisnero-Gil is not entitled to a reduction pursuant to the

24  safety valve, the base offense level remains at 32, and

25  paragraph 58 should be excised, should be cut.

1     There's then a two-level adjustment for obstruction of

2  justice.  The presentence report talks about Mr. Sisnero-Gil's

3  failure to appear in court, which is also Count Three, the

4  bail-jumping charge, and his flight for almost three years to

5  the Dominican Republic.  And that certainly would qualify as a

6  two-level obstruction of justice.

7     There's also, I guess, the additional obstruction of

8  justice that took place during the safety-valve proffer, and I

9  guess I want to hear from the government.  Are you arguing that

10 the false statements made during those proffers also would

11 constitute obstruction?

12    MS. LAKE:  Your Honor, we are requesting additional

13 points based on the statements made in proffers.

14    THE COURT:  But I didn't ask that.  I'm asking, do you

15 agree that that would constitute obstruction?  Your letter

16 seems to suggest as much.

17    MS. LAKE:  Actually, your Honor, that's not something

18 that occurred to me before, so I have not fully thought through

19 the analysis.  I apologize for that.

20    THE COURT:  Well, this is what you said in your

21 letter:  "His conduct since his arrest was troubling and merits

22 punishment.  He was not truthful about the circumstances

23 surrounding his flight from prosecution, lied about his

24 sisters' presence for certain meetings."  Induced the

25 government or was designed -- "This was all designed to induce

1  the government to sort of give him credit, and caused the

2  government to waste substantial time."

3          That would seem to meet the criteria for obstruction

4  of justice.  You stand by what's in your letter, right?

5          MS. LAKE:  Yes, your Honor.

6          THE COURT:  You said there were material

7  misrepresentations that were made, correct?

8          MS. LAKE:  Yes, your Honor.

9          THE COURT:  And that that material misrepresentation

10  actually caused the government to expend resources, right?

11          MS. LAKE:  That's correct.

12          THE COURT:  Okay.

13          So it seems to me that would be an additional basis

14  for an obstruction.  Now, this circuit, I think, has not yet

15  determined whether a defendant can get multiple enhancements

16  for multiple obstructions of justice, but the relevant cases on

17  this have left that as an open question.  *United States v.*

18  *Ventura* is the seminal case on this — it goes back to 1998.

19  That was a situation in which Judge Haight deemed that there

20  were multiple instances of obstruction.  He concluded that

21  3(c)1.1, the obstruction enhancement section, only allowed for

22  a single upward adjustment, and so he then departed -- he made

23  an upward departure for the other obstruction, and the Second

24  Circuit affirmed that, concluding that multiple acts of

25  obstruction, especially when they differ in kind or have

1  different obstructive objectives, can be found to fall

2  sufficiently far outside the heartland conduct of 3(c)1.1, so

3  that a departure would be warranted.

4  So I'm not going to impose an additional two levels,

5  but it does seem to me that there is an argument here for an

6  upward departure based on the multiple instances of

7  obstruction.

8  So I will, of course, find that the two levels in

9  paragraph 61 is appropriate.  That puts us, then, at level 34.

10  There is no acceptance of responsibility here.  I'm

11  not prepared to find an acceptance of responsibility.  This is

12  a man who fled days before trial and didn't return until he was

13  extradited after much time, and much effort, and expense by the

14  government to get him back here, so there's no acceptance of

15  responsibility.

16  So that, then, makes the total offense level 34.

17  Mr. Sinero-Gil has no prior criminal convictions in

18  the United States.  He has an arrest in Puerto Rico that didn't

19  result in any conviction that I can see.  So he's in Criminal

20  History Category I.  So that means that the guidelines range --

21  the offense level 31 and a criminal history level of I is 151

22  to 188.

23  So does anybody disagree with that guidelines

24  calculation?

25  MS. LAKE:  Your Honor, on the facts here, the

1  government does not disagree.

2          THE COURT:  Okay.

3          Mr. Storch?

4          MR. STORCH:  The same, your Honor.  The defense does

5  not disagree.

6          THE COURT:  Okay.  So that's the guidelines range, 151

7  to 188.  That's different than what was in the plea agreement

8  because the plea agreement contemplated that by the time of

9  sentencing, Mr. Sisnero-Gil would be eligible for the two-level

10  reduction under the safety valve.  But that is no longer the

11  case.  That results in the higher range of 151 to 188.

12          So, Mr. Sisnero-Gil, that's basically about 12 and a

13  half years up to about 17 -- no, not that many -- 15-1/2 or so.

14  Okay?

15          Again, that's just the guidelines.  I'm free to go

16  above or below the guidelines, and as I said here, there might

17  be a basis to go above the guidelines.  There might be a basis

18  to go below as well.

19          Now, there are other factors that I also have to

20  consider besides this book.  The other factors, I'll remind

21  you -- we talked about this when you pled guilty, but I'll

22  remind you again because it's been a while.  The other factors

23  that I have to consider include your own personal history, the

24  facts and circumstances of your life from your birth right up

25  until the present.  That includes all aspects of your

1  experience and your character.  I have to tailor the sentence

2  to you as a person.  That means looking at your entire history,

3  not just these crimes — there's more to you than that — and so

4  I have to consider the whole person as I fashion a sentence.

5      Another factor that I have to consider includes the

6  facts and circumstances of this offense.  This is an incredibly

7  serious crime, involving very, very dangerous drugs, in large

8  volumes.  The nature of this crime was also compounded by the

9  flight, lies to police officers in advance of -- when you were

10  first arrested, and the false statements in the safety valve.

11  Those are all things I have to consider.  I have to make sure

12  that the sentence that I impose reflects the seriousness of

13  this crime, reflects your culpability, that provides a just

14  punishment, and promotes respect for the law.  And, certainly,

15  someone who lies to the police, someone who flees from the

16  Court's jurisdiction when released on bail, and then who lies

17  to the government in a safety-valve proffer does not seem to

18  have a lot of respect for the law.  So I think it's important

19  that respect for the law be promoted, and this sentence is

20  going to be focused on that, among other things.

21      Another factor that I have to consider is the need to

22  deter or discourage you and others from committing crimes like

23  this in the future.  That's the hope, that by imposing a

24  sentence on you in this case, it will send a message to you and

25  to others who might learn of the sentencing, so that you and

1  they will think twice before ever engaging in conduct like

2  this.  It's hard to know what exactly will send that message.

3  I don't have a crystal ball, I can't predict with certainty

4  what a sentence of so many months will do to your likelihood of

5  doing this again.  I have to use my best judgment, but I

6  certainly want to send a message more broadly to the public

7  that fleeing days before a trial is something that does not

8  pay, and will be punished, so that anybody who is ever on bail

9  and confronted with a situation where they can run or stay and

10  go to trial will do the latter.  So that's going to be also a

11  relevant and significant portion of any sentence that I impose.

12         I have to consider your own needs while you're in

13  custody, so to make sure that while you're in custody, you're

14  getting access to healthcare, you're getting access to mental

15  health treatment, substance abuse treatment, although, in your

16  case, I don't think that's an issue, but certainly some

17  defendants have a need for treatment.  I have to make sure that

18  you're getting access to educational opportunities, and work,

19  and job training, things like that, that will help you when you

20  get out to be more successful, will allow you to be productive

21  when you return to society, so I have to consider that.

22  Finally, I have to consider the need to deter unwarranted

23  differences or disparities between your sentence and the

24  sentence imposed on others who are similarly situated to you.

25         No two people are exactly alike, but where there are

1    real strong similarities, it's important that the sentences be

2    similar, because if they were not, the sentences were all over

3    the place, then people might question the wisdom of the court,

4    and they might question the fairness of the system of justice.

5    So we want to have consistency, fairness, across defendants,

6    across regions.  So that's an important consideration as well.

7            My job today is to consider all of those different

8    factors and to come up with a sentence that I think is

9    appropriate in light of all of them.  And that's a hard thing

10   to do, because often some of these factors might argue for a

11   lenient sentence, while others might argue for a much harsher

12   sentence.  So I have the benefit now of the presentence report,

13   which tells me a lot about you and your family situation, your

14   work history.  It tells me more about this offense than what I

15   had on the day of your guilty plea.  I also have the benefit of

16   sentencing submissions from your lawyer and from the

17   government.  I have various attachments that were made to

18   Mr. Storch's submission, including letters from people who know

19   you well.  Those are very helpful.  I appreciated reading

20   those.  It gives me a fuller picture of you.  I've read all of

21   it very carefully because it's important.  This is a really

22   important day for you, it's an important day for your family.

23   The sentence I impose today is going to have a big impact on

24   you and other people, I'm aware of that.  There's nothing

25   harder that I do.  But sentencing is about a lot of different

1    factors, and I have to make sure that all of those different

2    objectives and purposes of sentencing are respected and

3    advanced by the sentence that I impose.

4            So those are the things I have to consider.  Do you

5    have any questions about any of those?

6            THE DEFENDANT:  No.

7            THE COURT:  Okay.

8            So what we're going to do now is I'm going to hear

9    from the attorneys.  I'll first hear from Mr. Storch.  He's

10   written a submission on your behalf, but I'll give him a chance

11   to elaborate on that and to speak more fully about who you are

12   as a person and about what he thinks would be an appropriate

13   sentence.  I may have questions for him as he's going, but I'll

14   give him an opportunity to speak about those issues.

15           I'll then hear from Ms. Lake.  She'll get a chance to

16   respond to Mr. Storch, to make additional points of her own

17   beyond what's in her submission.  I may have questions for her

18   as well.  I'll then give Mr. Storch an opportunity to respond

19   to Ms. Lake if he wishes.  And after they have finished, I'll

20   then give you an opportunity to address the Court if you wish.

21   You're not required to speak here today, Mr. Sisnero-Gil, but

22   you have a right to, and you'd be very welcome to.  So I'll

23   give you that opportunity if you'd like.

24           Once, finally, we're finished with all of that, then I

25   will finally tell you the sentence that I intend to impose,

1    I'll explain my reasons, I'll check with the lawyers to make

2    sure I haven't done something illegal or improper, and then,

3    assuming not, then I will formally impose the sentence.  So

4    that's how it will work.

5          We're in no rush.  This is a really important event.

6    Nothing today is going to be more important than this in my

7    life, so we're going to take our time.  If we need a break, let

8    us know that.  If you need a glass of water or something, let

9    us know that.  But we'll start now with Mr. Storch.

10         So, Mr. Storch, the floor is yours.

11         MR. STORCH:  Thank you, your Honor.

12         Your Honor, Mr. Sisnero is 38 years old, he is a legal

13   permanent resident, and referred to commonly as "legal," but

14   the most important word in "legal permanent resident" is

15   "legal."  So if somebody comes to this country and is given the

16   privilege to be here legally, you would hope that they use that

17   time constructively, work legally, pay taxes, raise their

18   children the best they can.

19         In this case, Mr. Sisnero unequivocally broke his

20   contract with society; it's not an indiscretion.  As your Honor

21   pointed out, the crimes, plural -- and it's a bifurcated

22   situation -- I'll address the narcotics trafficking, for which

23   he pled guilty to, as well as the failure to return to court,

24   which he separately pled guilty to as well.

25         Narcotics trafficking — and your Honor is perhaps best

1    equipped, has the most gravitas on the subject matter, perhaps

2    more than any circuit judge, not just in this circuit, but in

3    the country — is a serious blight in society, not a victimless

4    crime, it's very serious, and he must and should be punished.

5           The good news is that the system does work.  You have

6    dedicated agents of the DEA, United States Postal Service, who

7    investigate these crimes and a long line of outstanding

8    Southern District assistants who will prosecute these crimes,

9    end in your conviction.  And he must be held to account.

10          The second prong of his crimes, plural, is, of course,

11   his willful failure to appear in court.  It's especially

12   troubling not just for judges and prosecutors, but even for the

13   defense bar because I think, as your Honor mentioned in a

14   previous transcript, previous hearing, that government,

15   government prosecutors, and perhaps judges were reluctant to

16   permit defendants conditions of bond if not returning to court

17   becomes a prevalent matter.  In this case, there is absolutely

18   no excuse whatsoever to not appear in court.  Whatever may have

19   transpired is irrelevant.  The final responsibility rests with

20   Mr. Sisnero alone.

21          In my submission, I requested a nonguideline sentence

22   of 60 months.  That is, of course, withdrawn in light of the

23   fact of losing the safety-valve 1.2 reduction.  So in

24   determining a sentence, obviously, under 3553(a), some of the

25   considerations are the defendant's background.  And, in all

1  candor, I think Mr. Sisnero's background is, in medical terms,

2  unremarkable. Yes, he suffered an unpleasant childhood, with

3  abuse at the hand of his stepfather, but I submit to the

4  Honorable Court, there are perhaps many people who have

5  suffered such abuse, and have not resorted to crimes, and led

6  law-abiding, healthy lives.

7        This seems to be a situation where Mr. Sisnero had an

8  ability to lead a law-abiding life, unlike some other

9  defendants who appeared before the Honorable Court over the

10  years. He has worked in the construction trade, has skill

11  being a working person. It's not something to be ashamed of,

12  it's something to be proud of, it's a great way to support your

13  family. In this case, Mr. Sisnero is blessed with eight

14  children. There are many couples in the United States who have

15  difficulty even conceiving and having one child.

16        So these are choices that Mr. Sisnero made, voluntary

17  and of his own free will. This is not a situation where there

18  is a (unintelligible) of arrest or crimes committed that caused

19  greater harm; this is strictly a -- this was a greed motivation

20  for financial gain, and that is what it is.

21        Now, speaking of his children, the government, in

22  their sentencing submission, made reference, if he was so

23  concerned about his children, perhaps he would not have engaged

24  in this crime to begin with. Well, I submit to the Honorable

25  Court that when individuals are engaged in crime for financial

1  gain, worrying about other people is not an issue, it's a very

2  selfish act, but the net effect is he does have a large family

3  who will suffer because of his actions.  Nobody is to blame

4  except Mr. Sisnero.  And the Sentencing Commission takes into

5  consideration that individuals are going to be ripped out of

6  their family, a pod, so to speak; if he is separated, that's

7  one of the purposes of sentencing.  So that's an issue that's

8  obvious, but it's not unlike other families.

9          In this particular case, Mr. Sisnero did not show up

10  to court.  That's another contract that's broken with society

11  on several levels.  Mr. Sisnero enjoyed the consent of the

12  United States Government, and he was represented by Ms. Sabrina

13  Shroff.  And, as the saying goes, leading --

14          (Discussion off the record)

15          THE INTERPRETER:  Your Honor --

16          THE COURT:  Mr. Storch, just speak a little more

17  slowly and a little closer to the microphone if you can.  I

18  think the court reporter has been having some trouble hearing

19  you, and I think the interpreters as well.

20          MR. STORCH:  Okay, your Honor.  I'll start with the --

21  I'll go back to the government consenting to conditions of

22  release for Mr. Sisnero, and he abused that extension of

23  executive courtesy by the Department of Justice, by the

24  Assistant United States Attorney.  He was represented at the

25  time by, I believe, Sabrina Shroff.  And the comment I made was

1    that if you stick with the person that brings you to the dance,

2    then you leave with that person, so perhaps he would not be in

3    this position.

4         In the end, though — I want to state this repeatedly —

5    there is simply no excuse.  Whatever mitigating factors there

6    may be, in the final analysis, Mr. Sisnero failed to appear.

7    He did have proffer sessions with the government.  And in my

8    almost 30 years of practicing in this jurisdiction, sort of a

9    first, we have a situation like this, where the government, in

10   their submission, indicates that Mr. Sisnero was truthful as it

11   relates to narcotics trafficking.  In my submission, I make

12   reference that he provided information on individuals that

13   robbed him, so Mr. Sisnero knows firsthand that narcotics

14   trafficking is a dangerous undertaking.  He himself has been a

15   victim of a robbery.  He has himself to blame.

16        And as it relates to the rest of the proffer, you sort

17   of can't be half correct; you either successfully do or you

18   don't.  The information that was provided would be helpful to

19   the government in prosecuting other individuals.  I know the

20   Southern District takes drug robberies serious.  I believe

21   Billy Morock and some of his investigative colleagues are

22   always standing watch and looking to investigate these issues.

23        In terms of a number, range or a sentencing number, in

24   terms of years, that would be sufficient, but not greater, to

25   address all the factors of a defendant under 3553 —

1    retribution, deterrence, individual deterrence, incapacitation,

2    and rehabilitation — as your Honor pointed out, you can run,

3    but in waiting for (unintelligible) and brought back, and that

4    self-fulfilling prophesy has, of course, occurred.  The

5    government had to expend significant resources, interact with

6    their law enforcement partners in the Dominican Republic, and

7    there's disruption, but the process ran its course.  Let

8    Mr. Sisnero's apprehension, extradition, and subsequent

9    conviction serve as a deterrent to other individuals, both from

10   the Dominican Republic and other places, that there is a severe

11   price to be paid.  What exactly that number is is, of course,

12   left to distinguished judges and circuit judges, such as you,

13   with the wealth of information and experience you bring to

14   these proceedings.

15          In terms of the actual conspiracy, I'm saddened and

16   dismayed that Mr. Sisnero, his particular role, was not that of

17   a leader — and, again, I say this never by way of an excuse,

18   but by way as mitigation and laying a proper context — he was a

19   participant in a conspiracy, essentially a fungible individual

20   — he didn't bring any particular skill when he did it — and had

21   he not fled but properly safety-valved, his exposure would have

22   been, I believe, 63 to 78 months -- 70 months, and now, of

23   course, the numbers are off the charts, only because of his

24   selfish behavior.

25          I suggest to the Honorable Court that the government,

1    even at this juncture, even post safety-valve denial, is still

2    in the sentencing submission suggesting a sentence within the

3    stipulated guidelines.  I suggest to the Honorable Court any

4    sentence that's ten years or more is a significant sentence,

5    substantial sentence, that meets the retribution, deterrence,

6    incapacitation, and rehabilitation goals.  Rehabilitation is a

7    prospective matter, and I have never heard a defendant ever

8    tell a judge that they were not intending to change.  And that

9    prong, I believe, is, you have to walk the walk, not talk the

10   talk.

11          Since being incarcerated, Mr. Sisnero has not incurred

12   any infractions, and he will avail himself, of course, of any

13   vocational, educational training that the Bureau of Prisons

14   will deem him eligible for.  It's important to note that once

15   Mr. Sisnero has served his substantial sentence, he will be

16   promptly deported to his native Dominican Republic and barred

17   for life.

18          The ten-year area of sentencing range, your Honor, I

19   can only draw from a personal reference, is a long time, a

20   decade.  My wife and I (unintelligible).

21          THE COURT:  Again, I think the court reporter is

22   having trouble understanding you, so be a little closer to the

23   microphone and speak a little more slowly.

24          MR. STORCH:  Sure, sure.  Can you understand -- can

25   the Court hear me now?

KBIKSISS

1          THE COURT:  Yes.  Just slower and stay close to the

2     mic.

3          MR. STORCH:  Sure.  Thank you, your Honor.  I

4     apologize.

5          My daughter is turning ten years tomorrow.  Ten years,

6     that's a decade.  I can only imagine having the 1960s, '70s, or

7     '80s, or '90s eviscerated from my life.  I couldn't imagine the

8     last ten years without my daughter.  So being removed from

9     society for ten years — and let's be clear, totally because of

10    my client's selfishness — is a significant sentence.

11         So that as a starting point, your Honor, I think is

12    a -- and I submit to the Honorable Court, looking at all the

13    facts, his relevant role in this conspiracy, the need for the

14    Honorable Court to avoid sentence disparity, I look at some of

15    the sentences that were handed down by the Honorable Court —

16    for instance, Mr. Bastard, I believe, received ten years.  This

17    is a codefendant, a gentleman, who I think incurred another

18    federal narcotics case, a rather large narcotics case, I

19    believe, in Puerto Rico while this case was pending.  Some of

20    the other codefendants received, I think, eight months.  And

21    obviously, as your Honor correctly pointed out, federal

22    sentences are neatly tailored for each individual defendant.

23         It's my understanding — and, again, I dare not speak

24    for the government — that the issue that was raised during my

25    client's proffer as it relates to prior counsel and so forth is

1  an issue that the government -- and, again, I don't want to

2  speak for the government, there's an issue that's a central

3  underlying issue that can't be proven or not proven, it's just

4  the -- my client allegedly lied about an issue that related to

5  a date.  And the defense is not in a position to overcome that,

6  and, as I said, we withdraw the application for the safety

7  valve.

8          Looking at all these facts, even in the worst light

9  for the defendant, I do believe that he is an individual who

10  has the ability to lead a law-abiding life.  In all candor, the

11  best litmus test for how an individual is going to perform in

12  the future is past performance.  And based on Mr. Sisnero not

13  being able to follow any agreement, any break he's been given

14  in this case, makes his prognosis guarded, but I don't think

15  it's hopeless.

16          This particular case does not involve violence.  Of

17  course, we all know that narcotics trafficking brings with it

18  violence in various stages.  In this particular case, that's

19  something of a mitigating factor.  I suggest to the Honorable

20  Court, taking all the factors into consideration here,

21  including Mr. Sisnero's willful failure to appear, his not

22  being able to successfully safety-valve, a sentencing range

23  within the original stipulated guidelines range of 121 to 151

24  would meet that goal, your Honor, noting that the high end of

25  the original stipulated guideline range is also a number that

1   is within the new guidelines range, that takes into

2   consideration the failure to obtain safety valve, so that would

3   be a 151.

4           And I respectfully ask your Honor to consider imposing

5   that sentence.  And I thank your Honor for your consideration.

6           THE COURT:  Okay.  Thank you, Mr. Storch.

7           I'll now hear from Ms. Lake, for the government.

8           MS. LAKE:  Thank you, your Honor.  I don't have

9   anything to add beyond the government's sentencing submission,

10  but I'm, of course, happy to answer any questions that the

11  Court has.  I understand that the Court has had this case for

12  approximately five years, I think, at this point and is deeply

13  knowledgeable about the full case and the defendant's conduct,

14  particularly in fleeing, which is of deep concern to the

15  government, but, again, if the Court has any questions, I'm

16  more than happy to address them.

17          THE COURT:  Well, I do have one question about the

18  relevant culpability of the defendant and his codefendants.  So

19  I've sentenced Harold Dominguez to 70 months, Carlos Bermudez

20  Bastard to 120 months, Juan Rodriguez to 84 months.  Now, each

21  of those pleaded guilty before trial, so they got acceptance of

22  responsibility points.  I don't recall, off the top of my head,

23  whether any of them got obstruction points, but every case is

24  different, but in terms of their culpability, the role in the

25  offense, it's not obvious to me, from what's in the presentence

1    report or the government's letter, what exactly was the role of

2    these various people or what were the roles of these various

3    coconspirators.

4              MS. LAKE:  Yes, your Honor, I'm happy to address that.

5              My understanding of the facts is that Sisnero-Gil's

6    role was the most analogous to Dominguez's role.  His role in

7    the offense was to receive shipments of cocaine from Puerto

8    Rico.  He passed them on to Dominguez, who further distributed

9    them, and he received the money for the kilograms that were

10   distributed, and then he was responsible for getting that money

11   back to other members of the conspiracy.

12             THE COURT:  How?

13             MS. LAKE:  So --

14             THE COURT:  How did he get the money back?

15             MS. LAKE:  That was not clear to us, based on the

16   investigation or witness statements, exactly how he did that.

17             THE COURT:  Where -- to whom did the drugs go?  These

18   are people that were identified by Dominguez, or Sisnero-Gil,

19   or somebody else?

20             MS. LAKE:  I'm sorry, your Honor, I had a little bit

21   of trouble hearing the beginning of that question.

22             THE COURT:  Well, the drugs are ultimately handed off

23   by Dominguez, right?

24             MS. LAKE:  Yes.  Once Sisnero-Gil received them, he

25   passed them to Dominguez, and Dominguez further distributed

1    them.  That's my understanding.

2            THE COURT:  Okay.  But who is responsible for

3    arranging the people to whom the drugs go?  Who is the connect?

4    Who is connected to those people?

5            MS. LAKE:  I believe that was Dominguez.  Dominguez

6    was speaking with suppliers in Puerto Rico, and he was

7    distributing the drugs once they arrived here.  I don't have

8    information to suggest that Sisnero-Gil was aware of or

9    directing distribution beyond providing the drugs to Dominguez.

10           THE COURT:  So whose clients were they, is really my

11   question.

12           MS. LAKE:  I believe there was someone above -- in

13   New York above Dominguez and Sisnero-Gil, and they may have

14   been that person's clients, but I'm not crystal clear on that.

15           THE COURT:  Well, I have a forfeiture order that

16   indicates forfeiture in the amount of $30,000.  How was that

17   arrived at?

18           MS. LAKE:  That was arrived based on witness

19   statements about the quantity of drugs that Sisnero-Gil passed

20   along and how much he was paid.  So it was essentially his

21   profit, which is my understanding of how the government must

22   calculate forfeiture under *Honeycutt*.

23           THE COURT:  So his profit was on a per-kilo basis or a

24   per-transaction basis, what?

25           MS. LAKE:  I believe that it was per kilogram.

KBIKSISS

1          THE COURT:  So what was he getting per kilo?

2          MS. LAKE:  I believe it was -- our calculus was that

3     it was approximately 30 kilograms and a thousand dollars a

4     kilogram.

5          THE COURT:  What's the basis for thinking that it's

6     30 kilograms?

7          MS. LAKE:  Witness statements.

8          THE COURT:  Well, that doesn't tell me too much,

9     witness statements.  I mean, you seized 11 kilos of cocaine in

10    this case, right?

11         MS. LAKE:  Yes.  So the seized kilograms wouldn't have

12    factored into the forfeiture amount because Sisnero-Gil

13    wouldn't have been paid for those seized kilograms --

14         THE COURT:  Oh.  My point --

15         MS. LAKE:  -- but the total amount would be 41, but

16    the amount that he was paid for would be 30 kilograms.

17         THE COURT:  Okay.  And what was the duration of this

18    conspiracy?

19         MS. LAKE:  So the overall conspiracy, based on our

20    evidence, was 2014 to 2015.  The evidence of Sisnero-Gil's

21    specific involvement began in August 2014 and extended until

22    his arrest in May of 2015, so, approximately, I think it's ten

23    or so months.

24         THE COURT:  And what's the relationship between

25    Bermudez Bastard and Mr. Sisnero-Gil?

1          MS. LAKE:  I'm not aware of them having interacted

2     within the conspiracy in terms of the relative culpability.  I

3     think it's roughly similar.  Also relevant is the fact that, as

4     Mr. Storch referenced, Bermudez Bastard committed an offense

5     while he was on pretrial release in this case, and then -- it

6     doesn't, obviously, relate to the nature of involvement in the

7     conspiracy, but it is something that makes his overall course

8     of conduct more analogous to Sisnero-Gil's.

9          THE COURT:  Okay.  And what's the relationship between

10    Sisnero-Gil and de Diego Otero?

11         MS. LAKE:  I'm not aware of them having a direct

12    relationship within the conspiracy.  My understanding is that

13    de Diego Otero communicated with Dominguez, but I don't believe

14    there's evidence that he and Sisnero-Gil were directly involved

15    with one another.

16         THE COURT:  Well, except the drugs are sent from

17    Puerto Rico to Sisnero-Gil, right?

18         MS. LAKE:  Yes.

19         THE COURT:  So --

20         MS. LAKE:  I believe that was coordinated through

21    someone who was not charged, who was based in New York, and/or

22    Dominguez --

23         THE COURT:  Right --

24         MS. LAKE:  -- rather than Sisnero-Gil directly

25    coordinating with Otero.

1          THE COURT:  Well, it's a little strange for Dominguez

2     to be talking directly to de Diego Otero.  He's the one who

3     delivers the drugs, but he gives the money to -- the drugs all

4     go first to Sisnero-Gil, and the money goes back to Sisnero-Gil

5     from Dominguez.  That seems to me that if Dominguez has a

6     direct relationship with de Diego Otero, who's the supplier,

7     why do you even need Sisnero-Gil?  Why does he need to get the

8     money back?

9          MS. LAKE:  My -- this is me sort of making an

10    inference from the evidence, was that Sisnero-Gil was useful

11    because he could receive the shipments at the building where he

12    served as a superintendent, and he could have them addressed to

13    other residents in that building to accept the packages.

14         In terms of how he became involved, again, there was a

15    third person with whom Sisnero-Gil worked with in New York, and

16    said, essentially, you're going to work together on this, and

17    here is your role.  That's our understanding of how he got

18    involved and how he was given the role that he had.

19         THE COURT:  He gets the cash from Dominguez.  And so

20    where does he send the cash?  And why him?

21         MS. LAKE:  The fact that he was giving it back to

22    another member of the DTO in New York.

23         THE COURT:  But, again, why is it necessary for him to

24    do that and not Dominguez, since Dominguez is the one who's

25    talking directly to de Diego Otero, who's the supplier?

1          MS. LAKE:  That's an entirely fair question, and I

2     think the investigation was not able to answer that question.

3          THE COURT:  All right.

4          We also have the fact that Mr. Sisnero-Gil made false

5     statements to the police when he was arrested, then he flees,

6     and then he makes false statements to your office after he's

7     extradited.

8          MS. LAKE:  Yes.

9          THE COURT:  So what's the right additional punishment

10    for that?

11         MS. LAKE:  Your Honor, the government stands by the

12    recommendation in the sentencing submission, which is keyed to

13    the stipulated guidelines range in the plea agreement.

14         THE COURT:  The guidelines range in the plea

15    agreement, though, is wrong, right?

16         MS. LAKE:  Yes.

17         THE COURT:  So you're, nonetheless, saying that I

18    should sentence him to an erroneous guidelines range?

19         MS. LAKE:  So while the government acknowledges that

20    the Court correctly calculated the guidelines, it's our view

21    that we are, in some ways, bound to the guidelines range in the

22    plea agreement, given the ambiguity in the language of the plea

23    agreement regarding what we can do if we later determine that

24    the safety valve is not applicable.

25         THE COURT:  Well, I'm not so bound, and I don't intend

1    to be bound by that.

2              MS. LAKE:  Of course not, your Honor.

3              THE COURT:  Okay.

4              Anything else you want to add?

5              MS. LAKE:  No.  Thank you, your Honor.

6              THE COURT:  Okay.

7              Mr. Storch, anything else you want to say in response

8    to what Ms. Lake just said?

9              MR. STORCH:  Just briefly, your Honor.

10             Your Honor inquired about the relevant conduct of

11   Mr. Sisnero.  It's my understanding, also, that he -- and,

12   again, never by way of excuse, by way of mitigation or just the

13   way he fits in, that he was the individual who received drugs,

14   he did not have a possessory interest in the drugs, he did not

15   set prices, he did not know customers.  He passed the drugs on,

16   and, at some point, at some times, he was given proceeds to

17   hold onto — and, again, he had an apartment — and then passed

18   those on to other people higher up.  So he was not an

19   individual who had a vested interest.

20             And, again, I think to avoid sentence disparity, we

21   have a codefendant who did not abscond, but certainly was

22   involved and pled guilty to another major narcotics conspiracy

23   in another jurisdiction and received ten years.  I think that's

24   maybe a sort of a guidepost of the way to go.  As I've

25   indicated, the recalculation of the guidelines, correctly so,

1    is a level 34, and the stipulated guideline range, in terms of

2    where the defendant loses a direct appeal, is 121 to 151, and

3    the intersection is that 151.  And, again, I respectfully

4    suggest to the Honorable Court that a sentence in around that

5    range, 121 to 151, would be sufficient, but not greater.

6           Thank you again for your time, your Honor.

7           THE COURT:  Okay.  But that would be the guidelines

8    range if he just decided not to seek the safety valve.  He

9    didn't just decide not to seek the safety valve, he decided to

10   lie about the safety valve, according to what's been

11   represented to me, and it would seem to me that that makes this

12   worse.  You shouldn't be in the same boat as somebody who just

13   said, well, if I can't be truthful, I'm not going to come in

14   for a safety valve, he came in and decided he was going to try

15   to mislead the government.  That strikes me as more culpable

16   and merits a longer sentence than a person who just agreed not

17   to seek the safety valve.

18          MR. STORCH:  If I may, your Honor.

19          THE COURT:  Sure.

20          MR. STORCH:  An individual who captures and obtains or

21   intentionally knowingly engages in another conspiracy receives

22   ten years is also conduct that warrants significant punishment.

23   In this particular case, a sentence, let's say 151, takes into

24   effect already the calculus of losing acceptance of

25   responsibility.  The upper -- the two points for obstruction of

1    justice and the loss of safety valve is a two-prong loss,

2    right, it's the loss of two points, but also the ability to

3    potentially be sentenced below the statutory minimum.

4              THE COURT:  Right, but --

5              MR. STORCH:  The numbers, your Honor, are at such a

6    level already — we're not talking about 48 months versus maybe

7    78 months, but 151 months, even a decade, but let's say 151

8    months — is significant, it is a substantial sentence that

9    would be almost triple or certainly double, two and a half

10   times, the 63 or 70 months that Mr. Sisnero, his guidelines

11   range, would have been --

12             THE COURT:  Why do you say that?  I don't see how

13   that's within the range.  I don't see how you get to 63 to 70

14   months.

15             MR. STORCH:  If I may, your Honor, I think it would

16   be -- I stand corrected.  I think 70 to 87, because if the

17   level is 32, minus the two for safety valve is 30, minus three

18   for acceptance, because he lost, obviously, his three points

19   for acceptance, he would be at level 27, which is 70 months to

20   87.

21             THE COURT:  Right, 70 to 87 is what I calculated if he

22   had done the things that he didn't do.

23             MR. STORCH:  Right.  I misspoke, your Honor.  It's not

24   63, I apologize, your Honor.  It's 27, level 27.  So 70 months

25   at the low end, had he done what he was supposed to, and now

1   exposure of 151 months is more than double and a substantial

2   time.

3          Think of all the individuals who have committed acts

4   of violence and so forth.  And, again, it's so difficult to

5   compare, but also looking in this particular case, in this

6   conspiracy, some of the coconspirators who also, including one

7   who actually picked another case while this case was pending, I

8   think that a sentence of 151 is substantial, and it takes into

9   consideration the conduct, the intentional conduct, of

10  Mr. Sisnero of willfully not appearing.  And he has to be held

11  responsible — I'm his attorney, but I can admit this to the

12  Court — he must be separately punished, I understand that, but

13  it is a substantial sentence, your Honor, for somebody to

14  receive 151 months, navigate the prison politics, and then be

15  deported to his country.

16         And, also, there's one thing I forgot to address, and,

17  again, this is not something that Mr. Sisnero can get a benefit

18  from, but I think the Court can take into consideration, being

19  incarcerated at the MDC -- excuse me, at the MCC -- no, the

20  MDC, I apologize, at the MDC during this whole COVID crisis is

21  an added punishment that perhaps is not included in the

22  sentencing guideline calculus because you have no visitors, no

23  physical contact with any loved ones, not even with counsel.

24  And that is another added, I think, additional punishment,

25  which, of course, he only has himself to blame to be there,

1  that the Court may factor in.

2         I thank your Honor for your time.  You're very

3  thorough, and you've gone through every minor detail, and I

4  submit to the Honorable Court that 151 months is substantial,

5  and very significant, and addresses all Mr. Sisnero's willful

6  and intentional conduct and will serve as a deterrent to other

7  individuals in this jurisdiction, as well as perhaps people in

8  the Dominican Republic, that the Southern District, if you

9  commit a crime and if you run, you will be investigated for the

10  underlying narcotics conspiracies, prosecuted and convicted,

11  and no expense will be spared by the long arm of this

12  jurisdiction, that you will be brought back to justice, and you

13  will be severely punished.

14         Thank you, your Honor.

15         THE COURT:  Okay.  Thank you, Mr. Storch.

16         I did have one question for both of you on the

17  forfeiture order.  Is there an original someplace that's been

18  signed?

19         MS. LAKE:  Your Honor, my understanding is that

20  Mr. Storch wanted his client -- wanted to discuss it with his

21  client and have his client sign -- I think Mr. Storch has now

22  signed, but his client will still need to sign, if it's

23  possible, pass him a copy.  I'm not sure.

24         MR. STORCH:  Your Honor --

25         THE COURT:  Go ahead, Mr. Storch.

1    MR. STORCH:  Thank you, your Honor.

2    I received the forfeiture order last night.  I signed

3    it this morning, and I believe it was emailed to Ms. Miller and

4    the government.  I signed it this morning with the help of

5    the -- I discussed the issue of forfeiture beforehand, but the

6    actual four corners of the document, I didn't receive until

7    last night.  And I discussed it with the help of the

8    court-certified interpreter before your Honor took the bench,

9    and I went through the documents and explained it to my client,

10   and he will voluntarily sign said document.

11   I emailed the document to the Court of Appeals' second

12   email address, and I think Ms. Miller may have it, and I will

13   check in with my intern.

14   THE COURT:  Let me check.

15   Do you have the most recent copy, a hard copy?

16   THE LAW CLERK:  I have a hard copy, but this is not

17   signed by Mr. Storch.

18   THE COURT:  Okay.

19   So what we have, I think, is just what we got from the

20   government last night, and that is a four-page document,

21   five-page document.  On the last page, it is signed by Ms. Lake

22   and then has signature lines for Mr. Sisnero-Gil and for you,

23   Mr. Storch, but I don't have your signed one.

24   MR. STORCH:  I'm going to check with my office right

25   now.  I instructed him to email it to your email address.  I

1    can do that forthwith again.

2           THE COURT:  I don't have a printer -- I don't know if

3    I have a printer here that I can use anyway, but you've gone

4    over this with your client?

5           MR. STORCH:  That is correct, your Honor, I did.

6           THE COURT:  And you had an opportunity to see if he

7    had any questions about any of this?

8           MR. STORCH:  Yes, your Honor.  We discussed the

9    forfeiture issue previously, and this morning, I explained to

10   him, and we went through it again specifically, that pursuant

11   to his conviction, volunteer plea of guilty to a narcotics

12   conspiracy, and his criminal conduct in distributing narcotics,

13   there is a forfeiture element, and that the amount that the

14   government and I had discussed and that's a reasonable

15   foreseeable amount is $30,000.  And Mr. Sisnero answered me

16   that he voluntarily and knowingly agrees that that is the

17   correct amount.  That is, of course, subject to the Honorable

18   Court's plenary powers of review and approval.

19          THE COURT:  All right.  But this was translated

20   verbatim to him?

21          MR. STORCH:  Your Honor, I did a sum-and-substance

22   translation that -- what I mean by that is, I made sure that he

23   understands the relevant legal terms and elements.  And before

24   that, I discussed with him verbatim that the federal forfeiture

25   orders are usually the same and consistent as relates to the

1    subject matter.  But to answer the question, your Honor,

2    Mr. Sinero knows and understands all the legal elements of the

3    forfeiture order, and the mechanism how it will be made, and

4    the $30,000 forfeiture amount, your Honor.

5            THE COURT:  Okay.

6            Mr. Sinero-Gil, do you have any questions about this

7    forfeiture document?

8            Did you have an opportunity to discuss this with your

9    attorney?

10           THE DEFENDANT:  Yes.

11           THE COURT:  Do you have any questions about it now?

12           THE DEFENDANT:  No.

13           THE COURT:  No?  All right.

14           And you basically consent to your forfeiture order of

15   $30,000 as the proceeds of this crime?

16           THE DEFENDANT:  Yes.

17           THE COURT:  And you understand that even if you don't

18   have the money now, you could be ordered to pay a judgment from

19   substitute assets, money that you would earn later perhaps,

20   little by little, get taken from paychecks and things like

21   that?

22           Do you understand?

23           THE DEFENDANT:  Yes.

24           THE COURT:  Okay.  All right.  Thank you.

25           So, Mr. Sinero-Gil, as I said before, you have a

1  right to address the Court if you'd like.  You're not required

2  to, but you certainly have a right to.  Is there anything you

3  would like to say before I impose sentence?

4          THE DEFENDANT:  Yes, your Honor.

5          I would like to say that I accept responsibility for

6  the criminal activity of the past and for having jumped my

7  bail.  It was a decision that I took as an adult.  And I also

8  accept responsibility for not having appeared in court when I

9  had to be there.

10         That's it.  I want to apologize to my family for the

11 damage, for the hurt, that I have caused them, and to my

12 children.  They have really needed me during all of this time.

13 And to my mother, who doesn't deserve everything that I have

14 put her through.

15         I apologize for everything.  That's all.

16         THE COURT:  All right.  Thank you.

17         Take a minute to collect your thoughts and just to

18 catch your breath.  This can be an emotional time, and I

19 understand that.

20         (Pause)

21         THE COURT:  Are you ready to proceed, Mr. Sisnero-Gil,

22 or do you need a minute?

23         THE DEFENDANT:  Yes.

24         THE COURT:  Okay.

25         Well, let me tell you the sentence that I intend to

1    impose and my reasons for it.

2           THE DEFENDANT:  I can't hear.

3           (Pause)

4           THE COURT:  Let me tell you the sentence that I am

5    going to impose and let me tell you my reasons for the

6    sentence.

7           In our system of justice, judges have to give reasons,

8    they have to explain their sentences, and I think that's a good

9    thing.  I don't think a defendant should ever have to wonder

10   what the judge was thinking.  Nor should the defendant's

11   family, because, as you said, family members are often greatly

12   affected by a sentence.  They are in many ways innocent victims

13   of crimes like this.

14          But the public shouldn't have to wonder either because

15   the public has an interest in what happens in cases like this

16   one that involve serious crimes.  And so we do it all in the

17   open, we do it on the record, we create a transcript, and the

18   judge has to explain.

19          As I said before, sentencing of another human being is

20   about the most difficult thing that a judge does.  It's hard —

21   it should be hard — but it's an important responsibility, maybe

22   the most important responsibility that a judge has.

23          I told you the different factors that I have to

24   consider.  I won't repeat them, but I'll just explain how they

25   affect the sentence that I impose in this case.

1          I'll start with the crime.  This is a really serious

2     crime.  This case involved the distribution of large quantities

3     of cocaine.  That's a really powerful drug, that destroys a lot

4     of lives and a lot of families.  I think you understand that.

5     I don't think you're an unintelligent man, but you chose to be

6     involved in something that carries so much destruction because

7     there is money in it.  You're not the first person to do that,

8     but the fact is that this is a really serious crime that has to

9     be punished.

10          You have eight children.  I imagine your greatest

11     fear, for each of them, is that they would somehow be insnared

12     by an addiction to a drug like the one that you were

13     distributing because that drug destroys lives, whether in

14     powder form or in crack cocaine form.  There are a lot of

15     people whose lives are ended by that drug.  People die from

16     overdoses of that drug every year, by the thousands.  And there

17     are other people who, if they don't die, they certainly are

18     diminished by it.  Their ability to be productive and work,

19     their ability to maintain relationships, their ability to meet

20     their potential is diminished by this drug.  And so there's a

21     reason why our system of justice, why our society, imposes such

22     serious penalties for this — because we need to send the

23     message that this is wrong, this is evil, this is bad, and it

24     has a real impact, a real destructive impact, so we have to

25     send that message, we have to make sure that the punishment

1    fits the crime.  And this was a serious crime.

2            You weren't the only one involved in this conspiracy,

3    there were others as well, but you knew what you were doing.

4    So that's bad.  The mandatory minimum sentence for the drug

5    crime is ten years.  Now, there's a safety valve that lets

6    people out in certain circumstances.  There are ways to reduce

7    one's sentence, by pleading guilty in advance of trial, but if

8    you went to trial, as is your right, you'd be looking at least

9    ten years, under the guidelines, even higher than that, just on

10   the guidelines.  Now, I can't say that's wrong, I can't say

11   that's too serious or too draconian, because that is the

12   powerful and negative impact that these drugs have.

13           But there's more to it in this case because it's not

14   just that you were involved in distributing drugs in large

15   quantities, it's that you showed no respect for the law at all.

16   Committing the crime shows a lack of respect.  But you, when

17   you were caught, decided to make false statements to the law

18   enforcement officers, telling a story about how you didn't know

19   what was in the stuff, that you were just sort of duped into

20   doing it, which wasn't true.

21           You then get arrested and bailed, in which you signed

22   a bond, in which you sworn that you would return to court,

23   comply with all the conditions of your bail, you induced your

24   sisters to sign a bond, putting themselves on the hook for

25   $100,000, you then were released as a result of that.  And

1    then, days before trial, you disappeared, you just took off.

2    You, again, showed no respect for the law, no respect for the

3    Court, no respect for the process.  That's quite rare.  It's

4    rare that people do what you did.  I was shocked.

5              And so then I brought in your sisters, and I said to

6    them, look, you're on the hook, you're responsible for this

7    $100,000, he just left you with a $100,000 judgment against you

8    that you now have to pay, but I said to them, if you can get in

9    touch with your brother and tell him to get back here, I will

10   vacate the judgment against you, the two sisters, because I

11   didn't want them to be on the hook for this.  But you couldn't

12   be persuaded.  You stayed in the Dominican Republic for three

13   years, basically.  You made no attempt to come back, you made

14   no attempt to be responsible, you made no attempt to get your

15   sisters out of a jam.  You decided, selfishly, that you were

16   going to do it your way, and it was only until the government,

17   with a lot of prodding from me, spent a lot of time, and

18   energy, and resources to find where you were, to do the legal

19   paperwork of getting an extradition order, working with

20   Dominican authorities to find you, arrest you, and execute on

21   that order.  It was only then that you were returned, because

22   you didn't care.

23             You came back here at that point.  The situation had

24   changed quite a bit, so you pled guilty pursuant to an

25   agreement with the government, and then you took advantage of a

1    safety-valve provision that could help you.  Even with all the

2    obstruction, even with all of the fleeing and lies, you still

3    were able to take advantage of that safety valve, and, yet, you

4    lied again.  I can't draw any other conclusion from what I have

5    received other than you lied to the government in the context

6    of the safety-valve proffer and in statements that you made to

7    the government as part of an effort to mislead them, to induce

8    them to give you a benefit that you weren't entitled to, again,

9    showing tremendous disrespect for the court system, for the

10   law, this entire process.

11           So I'm not sure why you did all those things.  You

12   seem to regret them now, you're very remorseful about it now,

13   and I understand, but there are consequences.  There are

14   consequences.  Your codefendants didn't do this.  Mr. Dominguez

15   didn't do it this way; he did it in a different way.  He got a

16   much lower sentence as a result.  You got the advantage of

17   three years living as a fugitive, as a free man, in the

18   Dominican Republic, and maybe for the last three years, you

19   thought you were smarter than everybody.  But you weren't, it

20   caught up to you, and so now we're back here, and I have to

21   tell you, I'm not inclined to give you any breaks because you

22   haven't demonstrated that you deserve any breaks.  Your lack of

23   respect for the law has been consistent and extraordinary.

24   Most people don't do it this way, and the message has to be

25   sent that there are consequences when you do it this way.

1        So I think it's important that every defendant who

2    learns about your case knows what happens when you break your

3    trust with the Court, when you flee, and lie and, try to

4    manipulate the system that is genuinely designed to just try to

5    do the fair and just thing.  This is not vindictive — I'm not

6    angry, I'm not doing this out of frustration or anger — it's

7    simply that there have to be consequences because the message

8    has to be sent.

9        So if you had gone to trial, if you had stayed and

10   gone to trial and lost at trial, you would have been looking at

11   ten years.  Maybe you could have qualified for the safety

12   valve, that might have saved you a couple of years, and it

13   might have allowed me to sentence you below ten if you

14   qualified, but ten years is what your baseline was.  But your

15   flight, your obstruction, your absolute lack of respect for the

16   law, coupled with the seriousness of this crime, coupled with

17   your lack of acceptance of responsibility, your lack of

18   remorse, your continuing attempt to mislead the government and

19   the Court, that suggests to me that a much higher sentence is

20   appropriate.  I know Mr. Storch a long time, he's a good

21   lawyer, and he had a tough job here today because he had to

22   clearly acknowledge the very bad facts of this case while still

23   arguing for something that would be in your best interests.

24   That's a hard thing to do.  Some cases are harder than others,

25   and I think this is a very hard one.  I think Mr. Storch has

1  done a good job portraying you in the best light, encouraging

2  the Court to be patient and forgiving. That's his job, and I

3  think he's done it reasonably well. The government seems to be

4  more concerned of preserving its plea agreement here than

5  anything else, but, look, that doesn't matter. What the

6  lawyers say is useful, I listen, but it's ultimately my

7  responsibility and my call.

8      So, candidly, I think that a sentence above the

9  guidelines is appropriate here. The guidelines here are 151 --

10  let me sure I've got it right — 151 to 188. I think that there

11  are good reasons to go above that because the message has to be

12  sent.

13      On the other hand, you don't have a serious prior

14  criminal history, and, frankly, I like round numbers, I don't

15  like to get into oddly configured numbers. It seems to me --

16  when I got up this morning, it seems to me for the last couple

17  of months as we've been putting off sentencing, that a sentence

18  of 15 years is appropriate — 15 years, 180 months. I think

19  that's an appropriate sentence in light of everything that went

20  on here. I think it sends the message. I don't have to go

21  over the guidelines to do that. I think I could justify doing

22  that, but I don't think it's necessary. So I think 180 months,

23  15 years, is the lowest sentence I'm prepared to give that will

24  still give effect to all the different purposes of sentencing

25  that I talked about before.

1        So that's the sentence that I intend to impose.

2   Because Count Three requires a consecutive sentence, I will

3   do -- I think it will be 150 months on Counts One and Two,

4   followed by 30 months consecutive on Count Three.  In addition,

5   there will be supervised release of five years, with terms and

6   conditions set forth in the presentence report.  We'll get to

7   that.  I'm going to order forfeiture in the amount of $30,000.

8   So that's basically the sentence that I intend to impose.

9        Is there any legal impediment to my imposing that

10  sentence?  Ms. Lake?

11        MS. LAKE:  No, your Honor.

12        THE COURT:  Mr. Storch?

13        MR. STORCH:  Not from the defense, your Honor.

14        THE COURT:  Okay.

15        So let me ask you, then, to stand, Mr. Sisnero-Gil.

16        Mr. Sisnero-Gil, having accepted your guilty plea back

17  in -- what was it, May -- no, excuse me, September of 2019,

18  having adjudged you guilty on Counts One through Three at that

19  time, I now sentence you as follows:  I sentence you to a term

20  of incarceration, a total term, of 15 years, 180 months — that

21  will be 150 months on Counts One and Two, concurrent, followed

22  by 30 months consecutive on Count Three, for a total of 180.

23        In addition, I'm going to impose a term of supervised

24  release of five years.  That will be five years on Counts One

25  and Two, concurrent, three years on Count Three, also

1  concurrent, so a total of five years.

2         Now, there are terms and conditions associated with

3  supervised release.  There are the mandatory ones, which

4  include that you will not commit another federal, state, or

5  local crime;

6         That you will not possess or use a controlled

7  substance;

8         That you will cooperate in the collection of DNA as

9  directed by the probation office.

10        There are some standard conditions that apply in every

11 case.  There are a dozen of those, I will impose those here.

12 They are set forth in the presentence report.  And then there

13 are a couple of special conditions I'm going to impose as well.

14 The first is that you will obey the immigration laws and comply

15 with the directives -- the lawful directives of immigration

16 authorities.  I think it's likely that you will be deported.

17 You already self-deported anyway, so maybe you don't mind that,

18 but, in any event, it is likely that this conviction and this

19 sentence will result in you being deported back to the

20 Dominican Republic.

21        Now, you certainly have the right to challenge that,

22 there are legal means by which you can do that, but you must

23 otherwise comply with all the lawful directives of the

24 immigration authorities.

25        In addition, you are obliged to submit your person,

your residence, your place of business, your vehicle, any electronics that you have — a phone, an iPad, computer — you have to submit those things to a search by your probation officer in the event that the probation officer believes there might be evidence of a crime or evidence of a violation of the terms of supervised release.  That's not negotiable.  The rules don't permit that.

You have to also advise any adults with whom you reside or share premises that you are subject to this search warrant.  This is so that they can take steps to protect their own privacy and their own property.  So that's the reason for that.

Now, if you are deported, probation is not going to supervise you in the Dominican Republic, but if you are deported, you may not return to the United States without the express permission of the Attorney General or of the secretary of the Department of Homeland Security.  You can't just come back on your own.  If you were to come back without permission, that would be a crime.  It would also be a violation of the terms of your supervised release, which means that I could sentence you again for violating the terms of your supervised release, you could also then be prosecuted and sentenced for the new crime of illegally reentering the United States without permission following your deportation after a felony.

So I tell you that not to scare you, just to make you

1  understand that if you were to do that, the consequences will

2  be grave, and you will be fighting a resentencing here in front

3  of me, as well as potentially new charges related to an illegal

4  reentry that could be lead to penalties on top of my

5  resentencing.  So think carefully about that, okay?

6         I'm going to impose the special assessment of $300.

7  That's $100 on each count of conviction.  That's mandatory, you

8  have to pay that.

9         I'm not going to imposes a fine because I don't think

10  you have the ability to pay a fine.  I'm tempted to defray the

11  costs of extradition and the costs that were incurred as a

12  result of your flight, but the forfeiture on the bond is still

13  a judgment, so you'll have to pay that anyway.  So I'm not

14  going to impose a fine.

15         There is forfeiture for this crime or these crimes in

16  the amount of $30,000, as set forth in the order that you

17  reviewed with your attorney.  So I will issue that judgment

18  with this sentence, I'll issue that order.

19         There are open counts.  There are, I think, six, or

20  three, or four at least prior indictments that remain against

21  Mr. Sisnero-Gil.  Is the government moving to dismiss those?

22         MS. LAKE:  Yes, your Honor.  Thank you.

23         THE COURT:  I'm going to dismiss all the open counts

24  and all the prior indictments.

25         I should tell you that you have the right to appeal

1     this sentence if you wish, Mr. Sisnero-Gil.  If that's

2     something you want to do, talk to Mr. Storch.  He will file a

3     notice of appeal on your behalf if that's something you want

4     him to do.  You'll have to tell him, and he will have to file

5     that within two weeks.  There's a short timeline for that.  So

6     if that's something you want to do, make sure you let him know

7     within two weeks, so he can file a notice of appeal.  There's a

8     strict deadline.  Okay?

9            Mr. Storch, are there any recommendations you'd like

10    me to make with respect to the Bureau of Prisons and where

11    Mr. Sisnero-Gil will be housed?

12           MR. STORCH:  Yes, your Honor.  Respectfully, I would

13    ask the Court to recommend to the Bureau of Prisons --

14           (Video interruption)

15           THE COURT:  Have a seat.

16           (Pause)

17           THE COURT:  We really have ten seconds to go, we lost

18    the video and audio.  We now have audio back.  I just wanted to

19    hear Mr. Storch's request for a recommendation to the Bureau of

20    Prisons.

21           So, you cut out just as you were doing that.

22           MR. STORCH:  May I proceed, your Honor?

23           THE COURT:  Yes.  Keep your voice up nice and loud.

24           MR. STORCH:  Okay.  Your Honor, I respectfully ask

25    that the Court recommend to the Bureau of Prisons that my

1  client be housed in a facility close to the New York City

2  metropolitan area.

3          THE COURT:  New York City area is that what you said?

4          MR. STORCH:  I'm sorry, your Honor?

5          THE COURT:  Did you say close to the New York City

6  area?

7          MR. STORCH:  Yes, close to the New York City

8  metropolitan area, yes, your Honor.

9          THE COURT:  Okay.

10          All right.  I'm happy to make that recommendation.  I

11  can't order that, Mr. Sisnero-Gil, I can't order the Bureau of

12  Prisons to house you in a particular location, but I can

13  recommend it, and they usually try to honor those

14  recommendations.  So I'll make that recommendation in your case

15  since you have family in the area, and being close will enable

16  them to more easily visit you.  Okay?

17          Counsel, is there anything else we need to cover

18  today?

19          MS. LAKE:  Nothing from the government.  Thank you,

20  your Honor.

21          MR. STORCH:  Not from the defense, your Honor.

22          THE COURT:  Okay.  I mean, there are these two motions

23  from the cosigners who are asking me to vacate the judgment on

24  the bond.  I'm not inclined to do that, certainly for one who

25  appears to have been responsible for lying to the government.

1    I don't think we need to resolve that here today, but I'm going

2    to ask the government to respond to the letters from Ms. Colson

3    and Mr. Kirton on behalf of their clients who were cosigners,

4    okay?

5           MS. LAKE:  Yes, your Honor.

6           THE COURT:  And then with respect to sealing,

7    Mr. Storch?

8           MR. STORCH:  I'm sorry, your Honor.  I would ask that

9    the -- well, I don't think we discussed any other issues on the

10   record to be sealed.

11          In terms of the properties, your Honor, the other

12   people -- other individuals are represented by counsel, so I

13   have -- I leave that to their counsel.

14          THE COURT:  Yes, I don't think you need to be involved

15   in that.  I'm going to ask the government to respond to the

16   letters of the lawyers for the cosigners.

17          And then with respect to sealing, I don't think I need

18   to seal anything today.  I don't intend to, but if anyone

19   thinks differently, let me know.

20          MR. STORCH:  I agree with the Court, your Honor.  I

21   think I'll review the record, but I don't think there was

22   anything on it that was --

23          THE COURT:  There are a couple of sealed submissions

24   in connection with sentencing.  I've already ruled on those.

25   I'm going to allow those to remain sealed, at least for the

1    time being.  That may change, and I will revisit this in 30

2    days.  I'm going to ask the government to submit a letter,

3    cc'ing Mr. Storch, in 30 days as to whether the need for

4    sealing with respect to any of the sentencing submissions, or

5    any other submissions, should be lifted.  There's a presumption

6    of open records, and so that presumption would have to be

7    rebutted in order to continue sealing.

8                MS. LAKE:  Yes, your Honor.

9                MR. STORCH:  Yes, your Honor.

10               THE COURT:  All right.  So I'll issue a judgment

11   today.

12               Mr. Sisnero-Gil, good luck to you.  I hope that you

13   use the time productively, and that, ultimately, when you're

14   released, you'll be able to be a productive and law-abiding

15   member of society.  I think that's what is the best anybody

16   could hope for.  I think you're capable of it, but, certainly,

17   you didn't get off to a good start in this case.

18               Thank you very much.  Let me thank the marshals.  Let

19   me thank the interpreters and the court reporter, as well, and

20   then counsel for their patience with the technical glitches.

21   And let me thank the marshals as well for the technical help.

22               Have a good day.

23               MS. LAKE:  Thank you.

24               MR. STORCH:  Thank you.

25               THE COURT:  Okay.

1          MS. HESS:  Your Honor, he just told me he didn't hear

2     the sentence.

3          THE COURT:  Didn't hear the sentence?

4          THE DEFENDANT:  No.  Not the time.

5          THE COURT:  What?  I imposed the sentence, I said the

6     sentence.  What did you not hear?

7          THE DEFENDANT:  The time.

8          THE COURT:  The time?

9          THE DEFENDANT:  Yes.

10          THE COURT:  I said 180 months.  I said that three

11    times — 180 months total.  That's 15 years.

12          THE DEFENDANT:  Okay.

13                              * * *

14

15

16

17

18

19

20

21

22

23

24

25